# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

ANTHONY J. BURRIOLA,        )

       Plaintiff,       )      3:07-CV-00102-JCM-VPC

                     )

      vs.           )      __**REPORT AND RECOMMENDATION**__

                     )      __**OF U.S. MAGISTRATE JUDGE**__

STATE OF NEVADA, et al.,      )

                     )

       Defendants.     )      February 8, 2010

_____ )

      This Report and Recommendation is made to the Honorable James C. Mahan, United States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the court is defendants' motion for summary judgment (#128), plaintiff's "motion for judgment on the pleadings/summary judgment" (#s 120, 131 (accompanying exhibits)).  Plaintiff opposed defendants' motion for summary judgment (#145), and defendants replied (#149).  Defendants opposed the plaintiff's "motion for judgment on the pleadings/summary judgment" (#123), and plaintiff replied (#126).  Plaintiff has also filed a motion to supplement pleadings (#139), as well as a "motion pursuant to Rule 60" (#138).  For the reasons stated below, the court recommends that defendants' motion for summary judgment (#128) be granted in part and that plaintiff's remaining claims be dismissed without prejudice for failure to exhaust administrative remedies.  The court recommends that plaintiff's "motion for judgment on the pleadings/summary judgment" (#120), motion to supplement pleadings (#139), and "motion pursuant to Rule 60" (#138) be denied.

## I. HISTORY & PROCEDURAL BACKGROUND

      Plaintiff Anthony Burriola ("plaintiff"), a _pro se_ prisoner, is currently incarcerated at Southern Desert Correctional Center ("SDCC") in the custody of the Nevada Department of Corrections ("NDOC") (#122). Plaintiff brings his complaint pursuant to 42 U.S.C. § 1983, alleging violations of the U.S. Constitution and federal law, which allegedly occurred at Ely State Prison

1    ("ESP"), Lovelock Correctional Center ("LCC"), and Nevada State Prison ("NSP") (#11). Plaintiff

2    originally filed his civil action in the First Judicial District of the State of Nevada, in and for the

3    County of Carson City, on January 30, 2007 (#1).[1]  Defendants removed the case to federal court

4    on March 2, 2007, pursuant to 28 U.S.C. §§ 1441, 1443.  *Id.*  On April 26, 2007, plaintiff amended

5    his complaint (#11).  After initial screening, the court ordered counts I through VIII to proceed

6    (#25).[2]  Plaintiff names as defendants the State of Nevada, NDOC, Glen Whorton, Darrell

7    Rexwinkle, William Donat, James Baca, Elizabeth Walsh, Timothy Lietz, Vinson Scott, Valaree

8    Clifton, Daniel Collier, Jason Wood, Kelly Belanger, Robert LeGrand, Greg Cox, and Matt Tilley.

9    *Id.*

10         On October 6, 2008, after approximately five months of litigation, including stipulations for

11    dismissal of certain counts, the court issued an order designed to set forth the remaining claims on

12    which plaintiff could proceed (#82).  The court allowed plaintiff to proceed on the following claims

13    within the following counts: count I, retaliation; count II, violation of free exercise of religion under

14    the First Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and

15    due process under the Fourteenth Amendment; count IV, violation of plaintiff's right of access to

16    the courts; count V, interference with plaintiff's right to send and receive mail, retaliation, and

17    conditions of confinement under the Eighth Amendment; count VI, retaliation; and count VII,

18    violation of the First Amendment, RLUIPA, and equal protection under the Fourteenth Amendment.

19    *Id.*  The court dismissed plaintiff's counts III and VIII.[3] *Id.*

20         Plaintiff's claims each arise from distinct sets of facts.  Accordingly, the court addresses the

21    pertinent facts with respect to each count and claim.

---

[1]    Plaintiff indicates in his opposition that the case was filed on November 8, 2006 (#145, p. Ex. 5).  Although it appears that plaintiff submitted an application to proceed *in forma pauperis* in state court on that date, the complaint was filed on January 30, 2007 (#1, Exs. A, B).

[2]    The court did not dismiss any claims; however, it did dismiss co-plaintiff, Ms. Marla Polson, for lack of standing (#25).

[3]    Plaintiff sought to "appeal" the court's order and requested two extensions of time to do so (#s 85, 93).  The court granted both extensions (#s 89, 95); however, plaintiff never filed such an objection.

1    In count I, plaintiff claims that defendants retaliated against him because of his litigation

2  activities.  In May 2000, plaintiff purchased a typewriter (#11, p. 3).  Six years later, plaintiff's use

3  of the typewriter resulted in its need for maintenance and repair, requiring plaintiff to pack the

4  typewriter in a box and send it to a repair facility.  *Id.*  Plaintiff maintains that defendant Clifton took

5  custody of the package on May 6, 2006 at LCC.  Plaintiff testified in his deposition that prior to his

6  transfer from LCC to NSP, he saw "one of the officers during a move [drop] a property box on top

7  of my property box and that's where the typewriter was" (#128, Ex. A, p. 12; #11, p. 4).  Those at

8  the repair facility were unable to repair the typewriter, and the typewriter repair shop sent a

9  replacement (#11, p.4).  Once the replacement arrived at NSP, defendant Lietz refused to allow

10  plaintiff to take possession of the replacement (#128, Ex. A, p. 20).  Once again, plaintiff maintains

11  that this act, the withholding of his replacement typewriter, was in retaliation for plaintiff's litigation

12  activities, specifically his suit in federal court, *Burriola v. NDOC*, CV-N-04-0346-JCM(RAM)

13  (#11).

14    In count II, plaintiff alleges that defendants Collier and Wood confiscated his religious

15  publications in violation of his right to free exercise of his religion as well as federal law.[4]  On May

16  20, 2006, prison officials transferred plaintiff from LCC to NSP (#11, p. 6).  Defendants confiscated

17  numerous items of personal property from plaintiff, including fifty religious magazines (#128, Ex.

18  J).  Defendants confiscated the magazines pursuant to NDOC Administrative Regulation 711 ("AR

19  711"), which limits inmate possession of magazines to no more than ten.[5]  As a Jehovah Witness,

20  plaintiff asserts that the distribution of such periodicals is part of his faith and that plaintiff needs

21  numerous copies because the need to distribute such literature may arise at any time or place (#11,

22  p. 6).

23    In count IV, plaintiff alleges that NSP's substitution of physical access to legal materials with

24

---

25    [4]    Plaintiff also names defendants Belanger, Rexwinkle, LeGrand, and Cox.  Plaintiff does not

26  mention them by name except to say that he "requested justice and correction of these violations" and that
    the defendants "all participated in the violations instead by rationalizing that prison rules somehow pre-empt

27  the U.S. Constitution, and federal statutes & laws" (#11, pp. 2, 6-7).

28    [5]    AR 711.08 § 1.9 limits inmate personal property in the following manner, "Magazines
    overall total not to exceed ten (expendable property)" (#128, Ex. C, p. 21).

3

1   a "paging system" violates his right of access to the courts.  *Id.* p. 9.  Plaintiff maintains that his

2   inability to access legal materials resulted in a missed deadline in the filing of a suit.  *Id.* p. 11.

3   Plaintiff sought to "petition this court for judicial review of NDOC regulations and their

4   adjudication," pursuant to Nevada Revised Statutes § 233B.130.2 (c), but he claims that his inability

5   to conduct proper research resulted in him missing the thirty-day deadline to file.  *Id.* pp. 11-12.

6          In count V, plaintiff alleges three claims.   Plaintiff claims that defendants have interfered

7   with his mail.  *Id.* p. 15.   Next, plaintiff claims that defendants retaliated against him by placing him

8   in a more restrictive housing unit after he prevailed on a disciplinary appeal.  *Id.* p. 17.  Plaintiff also

9   claims that defendants violated his Eighth Amendment right against cruel and unusual punishment

10   when they housed him with a cigarette smoker.  *Id.*

11          In count VI, plaintiff claims that defendant Baca "intimidated Burriola to stop using

12   witnesses to his First Amend[ment] right in filing grievances."  *Id.* pp. 17-18.

13          In count VII, plaintiff alleges that Jehovah's Witnesses have been denied time to gather for

14   weekly study.  *Id.* p. 18.

15          The court notes that the plaintiff is proceeding *pro se*.  "In civil cases where the plaintiff

16   appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit

17   of any doubt."  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see*

18   *also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

19                          **II.  DISCUSSION & ANALYSIS**

20   **A.    Discussion**

21          **1.    Summary Judgment Standard**

22          Summary judgment allows courts to avoid unnecessary trials where no material factual

23   disputes exist.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

24   The court grants summary judgment if no genuine issues of material fact remain in dispute and the

25   moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In deciding whether

26   to grant summary judgment, the court must view all evidence and any inferences arising from the

27   evidence in the light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197

28   (9th Cir. 1996).  However, the Supreme Court has noted:

                                              4

> [W]e must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

### 2.    Exhaustion of Administrative Remedies

#### a.    Prison Litigation Reform Act

The Prison Litigation Reform Act of 1996 (the "PLRA") amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Although once within the discretion of the district court, the exhaustion of administrative remedies is now mandatory. *Booth v. C.O. Churner*, 532 U.S. 731 (2001). Those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter v. Nussle*, 534 U.S. 516, 524 (2002), citing *Booth*, 532 U.S. at 739-40 n.5. Even when the prisoner seeks remedies not available in the administrative proceedings, notably money damages, exhaustion is still required prior to filing suit. *Booth*, 532 U.S. at 741. Recent case law demonstrates that the Supreme Court

1   has strictly construed section 1997e(a).  *Id.* at 741 n.6 ("We will not read futility or other exceptions

2   into statutory exhaustion requirements where Congress has provided otherwise").

3        Plaintiffs must properly exhaust nonjudicial remedies as a precondition to bringing suit.  The

4   PLRA requires "proper exhaustion," meaning that the prisoner must use "all steps the agency holds

5   out, and doing so *properly* (so that the agency addresses the merits)."  *Woodford v. Ngo*, 548 U.S.

6   81, 89 (2006); *see, e.g., Jones v. Stewart*, 457 F. Supp. 2d 1131, 1134 (D. Nev. 2006) ("proper

7   exhaustion" consists of fully addressing the grievance on the merits and complying with all critical

8   procedural rules and deadlines).   Furthermore, the "language [of section 1997e(a)] clearly

9   contemplates exhaustion *prior to the commencement of the action* as an indispensable requirement."

10   *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002) (emphasis added) (quoting *Medina-Claudio*

11   *v. Rodriguez-Mateo*, 292 F.3d 31 (1st Cir. 2002).   Requiring exhaustion prior to filing suit furthers

12   the congressional objectives of the PLRA as set forth in *Porter v. Nussle*, 534 U.S. 516, 524-25.  *See*

13   *id.* at 1200.

14        **b.**   **NDOC Procedures**

15        The NDOC grievance procedure is governed by Administrative Regulation 740 ("AR 740")

16   (#128, Ex. E). In order to exhaust available remedies, AR 740 requires the following: (1) an informal

17   review process; (2) a first level formal grievance appealing the informal grievance decision to the

18   warden; and (3) a second level grievance, which is decided by the Assistant Director of Operations.

19   *Id.*   AR 740 requires NDOC officials to respond at each grievance level within a specified time

20   period, beginning from the date of receipt of the inmate's grievance. *Id*. Inmates are given six months

21   to file an informal grievance when the claims involve personal property damage or loss, personal

22   injury, medical claims or any other torts claims. *Id*., p. 14. Plaintiff then has five days after the return

23   of a decision based on the level of review to appeal the decision. *Id.*

24        **c.**   **Dismissal of Claims for Failure to Exhaust**

25        Failure to exhaust is an affirmative defense under the PLRA rather than a jurisdictional

26   requirement, and defendants bear the burden of raising and proving that the plaintiff has not

27   exhausted. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Wyatt v. Terhune*, 315 F.3d 1108, 1117 n. 9

28   (9th Cir. 2003), *cert denied*, 540 U.S. 810 (2003).   Inmates are not required to specifically plead or

1    demonstrate exhaustion in their complaints, rather, it is the defendant's responsibility to raise the

2    issue in a responsive pleading. *Jones*, 549 U.S. at 216.

3          Failure to exhaust is treated as a matter in abatement, not going to the merits of the claim,

4    and is properly raised in an unenumerated Rule 12(b) motion. *Wyatt*, 315 F.3d at 1119.   The court

5    may look beyond the pleadings and decide disputed issues of fact without converting the motion into

6    one for summary judgment; however, "if the district court concludes that the prisoner has not

7    exhausted nonjudicial remedies, the proper remedy is dismissal of the claim without prejudice." *Id.*

8    at 1119-20, *as noted in O' Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1059 (9th Cir. 2007); *see*

9    *also, Rizta v. Int'l Longshoremen's and Warehousemen's Union*, 837 F.2d 365 (9th Cir. 1988)

10   ("[F]ailure to exhaust nonjudicial remedies should be raised in a motion to dismiss, or be treated as

11   such if raised in a motion for summary judgment.").

12   **B.     Analysis**

13         Defendants raise the argument that plaintiff failed to exhaust his claims in their answer (#29,

14   p. 6), and they raise the argument here on summary judgment, presenting evidence of plaintiff's

15   failure to exhaust.

16         **1.     Counts V, VI, and VII: Exhaustion Requirement**

17         As noted above, the PLRA requires the proper exhaustion of administrative remedies prior

18   to bring the suit.  Defendants demonstrate that plaintiff has failed not only to properly exhaust certain

19   claims but also to complete the grievance process prior to filing suit.  Plaintiff argues that the PLRA

20   does not apply because the action was filed in state court and contends that defendants' failure to

21   properly address certain grievances constitutes an excuse from the exhaustion requirement.

22         The court disagrees.  A plaintiff's filing of a § 1983 claim in state court does not preclude

23   the need to properly exhaust remedies.[6] The language of § 1997e does not appear to be limited to

24

25         [6]     Under state law, plaintiff is required to exhaust administrative remedies.  Nevada Revised
26   Statutes section 41.0322(1) provides that prisoners must exhaust administrative remedies.  However, the
     remedies for failure to exhaust prior to filing suit differ in state and federal courts.  Nevada law requires that
27   an action must be stayed until administrative remedies are exhausted.  Nev. Rev. Stat. § 41.0322(3).  Federal
     law, as explained below, dismisses the claim without prejudice.  *See Wyatt v. Terhune*, 315 F.3d1108, 1119-
28   20 (9th Cir. 2003).

                                                    7

1    actions filed in federal court by prisoners, and the court has not located any authority declining to

2    apply § 1997e to removed actions. *See Johnson v. State of La. ex rel. Dep't of Public Safety & Corr.*,

3    468 F.3d 278, 280 (5th Cir. 2006) ("The PLRA's exhaustion requirement applies to all Section 1983

4    claims regardless of whether the inmate files his claim in state or federal court."); *Blakely v. Ozmint*,

5    2006 WL 2850545, at *2 (D.S.C. Sep 29, 2006); *Hodge v. Louisville/Jefferson County Metro Jail*,

6    2006 WL 1984723, at *4 (W.D. Ky., July 12, 2006); *Alexander v. Walker*, 2003 WL 297536, at *2

7    (N.D. Cal., Feb. 10, 2003).   In addition, plaintiff's argument that defendants failed to properly

8    respond to his grievances, thereby precluding him from complying with the procedural requirements,

9    has no merit.   Plaintiff and defendants both submit evidence of numerous grievances, many of which

10   are exhausted.   This evidence demonstrates that plaintiff was capable of exhausting and belies

11   plaintiff's assertion that he was unable to complete the process.

12           Next, the court examines whether plaintiff's evidence that his claims under counts V, VI, and

13   VII were properly exhausted prior to filing the suit.   Although it appears that plaintiff filed an

14   application to proceed *in forma pauperis* on November 7, 2006 (#148, Ex. 5), the civil action was

15   not commenced until January 30, 2007.   *See* Fed. R. Civ. P. 3 ("A civil action is commenced by

16   filing a complaint with the court.").   Although plaintiff amended his complaint in federal court on

17   April 26, 2007, and that is the operative complaint, the court looks to the date on which the action

18   was filed.   The commencement of the action – not the filing of the amended and operative complaint

19   – is the date by which a plaintiff must have completely exhausted his administrative remedies, and

20   the plain language of 28 U.S.C. § 1997e(a) lends support to this reading of the rule.   That provision

21   does not hold that administrative remedies must be exhausted prior to the filing of a particular

22   complaint.   Rather, it reads that "[n]o *action* shall be brought." 28 U.S.C. § 1997e(a) (emphasis

23   added).   That plaintiff was able to amend his complaint is irrelevant to the existence of the

24   underlying action.   *Cf. Telluride Mgmt. Solutions v. Telluride Inv. Group*, 55 F.3d 463, 466 (9th Cir.

25   1995) ("A dismissal of the complaint does not necessarily dismiss the action.").

26           Here, plaintiff's grievances concerning claims within counts V, VI and VII were not

27   exhausted by the operative date, i.e. the date of the commencement of the civil action, January 30,

28   2007.   Exhaustion during the pendency of the action does not satisfy § 1997e.   *See McKinney*, 311

                                                     8

1   F.3d at 1199.  Defendants provide a printout of plaintiff's grievances from May 2006 through

2   December 31, 2007 (#128, Ex. M-1), the authenticity of which is provided for by Mr. Don Helling,

3   Northern Deputy Director for the NDOC.  *Id.* ex. M.  In opposition to defendants' claim, plaintiff

4   presents his grievances to the court.  However, none of plaintiff's grievances evidence the exhaustion

5   of the grievance process prior to filing suit.[7]

6        Therefore, the court dismisses counts V, VI and VII without prejudice for failure to exhaust.

7        **2.    Count I: Retaliation**

8        "A prison inmate retains those First Amendment rights that are not inconsistent with his

9   status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v.*

10  *Procunier*, 417 U.S. 817, 822 (1974).  "Of fundamental import to prisoners are their First

11  Amendment 'rights to file prison grievances . . .'"  *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir.

12  2005) (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003)).  "Because purely retaliatory

13  actions taken against a prisoner for having exercised those rights necessarily undermines those

14  protections, such actions violate the Constitution quite apart from any underlying misconduct they

15  are designed to shield."  *Id.*  "Within the prison context, a viable claim of First Amendment

16  retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action

17  against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled

18  the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance

19  a legitimate correctional goal."  *Rhodes*, 408 F.3d at 567-68.

20      In this case, plaintiff claims that prison officials damaged his typewriter and withheld

21  delivery of a replacement in retaliation for his litigation activities.  Indeed, the destruction of

22  plaintiff's property would constitute an adverse act, an essential element in a claim for retaliation,

23  and plaintiff notes that he even witnessed a prison officer drop a box on top of the typewriter (#128,

24

25        [7]    In their reply, defendants indicate that plaintiff presents evidence of exhaustion as to one

26  claim in count V (#149).  Plaintiff presents in his opposition to defendants' motion for summary judgment

27  a "Grievance Printout," which demonstrates that he completed all three levels of review for grievance #
    20074-801, concerning the interference of mail (#145, Ex. 4).  However, the document clearly sets forth that

28  plaintiff initiated the grievance on January 5, 2007, and that the "Level 2" grievance was not completed until
    March 29, 2007.  *Id.*

1   Ex. A, p. 12). Plaintiff has also demonstrated that he engaged, quite extensively, in protected activity

2   by litigating against prison officials. However, plaintiff does not provide evidence of causation,

3   namely that the adverse act occurred *because of* plaintiff's litigation activities. Plaintiff points to

4   notes in his prison file, which indicates he was a "litigator" and "likes to grieve and do lawsuits"

5   (#119, pp. 2-3, 5, 19-20). According to plaintiff, the notes evidence an "agenda of retaliation"

6   against him. Notwithstanding that these notes could serve as the font for a host of retaliation claims,

7   the court fails to see how these notes demonstrate that the prison guard who damaged the typewriter

8   did so because of plaintiff's filing grievances and lawsuits. Not only does plaintiff fail to specifically

9   identify the officer or guard who damaged the typewriter, he presents no evidence that this guard was

10   a defendant or even aware of the notation in plaintiff's file. Because plaintiff fails to present any

11   factual issues concerning causation, the court grants summary judgment on count I.

12        With respect to plaintiff's claim that prison officials withheld his replacement typewriter,

13   plaintiff has not presented any genuine issues of fact concerning the absence of a legitimate

14   correctional goal. The District Court has found, and this court has taken judicial notice of that order,

15   that "the NDOC ban on typewriters is reasonably related to legitimate security interests." *See* #82,

16   p. 4 (citing *Nev. Dep't of Corr. v. Cohen*, No. 3:07-cv-00266-LRH-RAM (D. Nev. Aug. 27, 2008).

17   Failure to present any facts regarding this essential element is fatal to plaintiff's claim.

18        Defendants have established that no genuine issues of material fact exists as to essential

19   elements of plaintiff's retaliation. Accordingly, the court grants summary judgment to defendants

20   on the sole claim of retaliation in count I.

21        **3.     Count II: Free Exercise, RLUIPA, and Due Process**

22        On May 20, 2006, prison officials transferred plaintiff to another NDOC facility (#11, p. 6).

23   At that time, defendants Collier and Wood confiscated plaintiff's personal property. Defendants

24   argue that they followed AR 711, which limits an inmate's possession of magazines to no more than

25   ten (#145, p. 13). Plaintiff argues that the enforcement of AR 711 violates his free exercise of

26   religion protected under the First Amendment, his rights under RLUIPA, and his right of due process

27   under the Fourteenth Amendment.

28

1              a.      Free Exercise Clause

2          "Convicted prisoners do not forfeit all constitutional protections by reason of their conviction

3  and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).   However, "lawful

4  incarceration brings about the necessary withdrawal or limitation of many privileges and rights. . ."

5  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston*, 334 U.S. 266,

6  285 (1948)).    A prisoner's right to free exercise of his or her religion is necessarily limited by

7  incarceration, and may be curtailed to achieve legitimate correctional goals or to maintain prison

8  security. *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam).   To implicate the Free

9  Exercise Clause, a belief must be "sincerely held" and "rooted in religious belief." *See Shakur v.*

10 *Schriro*, 514 F.3d 878, 885 (9th Cir. 2008) (holding that the sincerity test set forth in *Malik v. Brown*,

11 16 F.3d 330, 333 (9th Cir. 1994), and *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981),

12 determines the applicability of the Free Exercise Clause).

13         "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid

14 if it is reasonably related to legitimate penological interests." *Shakur*, 514 F.3d at 883-84 (quoting

15 *Turner v. Safley*, 482 U.S. 78, 89 (1987)).   *Turner* sets forth four factors to be balanced in

16 determining whether a prison regulation is reasonably related to legitimate penological interests.

17 "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate

18 governmental interest put forward to justify it." *Turner*, 482 U.S. at 89.   Second, the court must

19 determine whether there are "alternative means of exercising the right that remain open to prison

20 inmates." *Id.* at 90.   Third, the court must consider "the impact accommodation of the asserted

21 constitutional right will have on guards and other inmates, and on the allocation of prison resources

22 generally." *Id.*   Fourth, "the absence of ready alternatives is evidence of the reasonableness of a

23 prison regulation."

24         The first *Turner* factor requires determining whether there is a legitimate penological interest

25 that is rationally related to the disputed regulation.   Here, the defendants raise several concerns with

26 respect to AR 711.   Defendants point to the cost and administrative burden of allowing prisoners an

27 unlimited amount of magazines.   Defendants also note the increased amount of time to inventory and

28 individually search each magazine, the added weight in transport, the increased fire danger of bulk

1    materials, and the added security risk of prisoners bartering items (#128, p. 15).   Plaintiff responds

2    that other regulations permit a prisoner to have up to fifty pounds of legal work and contends that

3    this regulation demonstrates that NDOC's limit is not rationally related to its professed objectives.

4    That the prison allows large boxes of *legal* work to be transferred with an inmate does not

5    demonstrate the absence of a rational nexus between the instant regulation and the prison's interest

6    in reducing administrative burdens and preserving the safety of the institution.   Thus, the first factor

7    favors the defendants.

8            The second *Turner* factor examines whether plaintiff has "alternative means by which he can

9    practice his religion" or is "denied all means of religious expression."   *Shakur*, 514 F.3d at 886.

10   Here, plaintiff is not being precluded from the practice of his religion.   Plaintiff asserts that he has

11   an obligation to distribute publications and that Jehovah's Witnesses must report the number of

12   publications they have distributed (#145, p. 11).   He further complains that he "must be prepared

13   with a varity [sic] of publications to distribute on the spot, least [sic] the potential recipient be lost."

14   *Id.*   Defendants indicate that plaintiff may direct those persons to the prison chapel where such

15   personal property restrictions are not imposed.   Moreover, plaintiff can distribute the magazines in

16   his possession and order replacements because the regulation merely keeps the number of magazines

17   in an inmate's current possession to no more than ten.   Indeed, plaintiff's argument that he somehow

18   needs more than ten publications for distribution is belied by another section of his brief in which

19   he states that Jehovah's Witnesses are "a most hated, and small, most alienated religion within the

20   prison walls [and that] there are very few people who want to, or who are able to adhere to the tenets

21   of JW's" (#145, p. 13).   Given the limited number of "potential recipient[s]," a potential convert's

22   access to the prison chapel, and plaintiff's ability to obtain replacement publications, plaintiff has

23   alternative means to practice his religion and is by no means denied "all" religious expression.   This

24   second factor weighs in favor of defendants.

25           The third *Turner* factor considers the "impact accommodation of the asserted constitutional

26   right will have on guards and other inmates, and on the allocation of prison resources generally."

27   *Turner*, 482 U.S. at 90.   Defendants emphasize that accommodation of plaintiff would result in

28   extension of the accommodation to all inmates.   As noted in *Ward v. Walsh*, 1 F.3d 873, 878 (9th

1   Cir. 1993), while not irrelevant, perceived favoritism is not in itself dispositive.  Defendants also

2   submit the affidavit of Don Helling, NDOC Deputy Director, who justifies the need for the

3   limitations on personal property in AR 711 (#128, Ex. M).  Mr. Helling asserts that unlimited

4   personal property possession results in significant increases in prison guards' time to inventory

5   property and that the increased weight of personal property poses an increased risk of injury to prison

6   guards who must transfer inmate property.  Unlimited possession of magazines by inmates also

7   results in a fire danger. These findings demonstrate that the accommodation will have an impact on

8   guards.  Plaintiff argues that where the inmate has enough room in his foot locker or duffel bag, it

9   should not matter what the items are (#145, p. 12).  This is a fair argument, but the court is hesitant

10  to second guess the intricacies of the NDOC rule.  This court is aware that prison administration is

11  an "inordinately difficult undertaking that requires expertise, planning, and the commitment of

12  resources, all of which are peculiarly within the province of the legislative and executive branches

13  of government." *Resnick v. Adams*, 348 F.3d 763, 770-71 (9th Cir. 2003).  Because an exception

14  for plaintiff would place burdens on the prison with respect to safety, time, and resources, this factor

15  weighs in favor of defendants. *See Henderson v. Terhune*, 379 F.3d 709, 714 (9th Cir. 2004).

16          The fourth *Turner* factor requires consideration of whether "there are ready alternatives to

17  the prison's current policy that would accommodate [plaintiff] at de minimus cost to the prison."

18  *Shakur*, 514 F.3d at 887.  "[T]he absence of ready alternatives is evidence of the reasonableness of

19  a prison regulation," *Washington v. Harper*, 494 U.S. 210, 225 (1990), while the existence of

20  alternatives may be "evidence that the [policy] is not reasonable but is an 'exaggerated response' to

21  prison concerns," *Turner*, 482 U.S. at 90-91.  Once again, plaintiff maintains that defendants could

22  restrict property based on weight or volume.  However, defendants reiterate that unlimited

23  possession of single item could lead to bartering, which poses a risk of inmate exploitation and safety

24  to the institution.  See *Mauro v. Arpaio*, 188 F.3d 1054, 1061 (9th Cir. 1999).  While there are

25  conceivable alternatives to the magazine-limiting regulation (e.g. limitations by weight), an

26  exception to the prison policy would create a burden on the defendants and hamper a majority of its

27  interests in efficient administration.  "When it comes to judicial review of prison regulations,

28  'separation of powers concerns counsel a policy of judicial restraint.' " *Resnick v. Adams*, 348 F.3d

13

763, 771 (9th Cir. 2003) (quoting *Turner v. Safely*, U.S. 482 at 85). Accordingly, the court finds that this factor slightly tips in favor of defendants.

Based on the record, the regulation limiting the number of magazines to ten is reasonable and cannot and not an invalid infringement of plaintiff's First Amendment rights.

### b.    RLUIPA

The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq*., provides in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "Religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "A person may assert a violation of [RLUPIA] as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a).

To establish a RLUIPA violation, the plaintiff bears the initial burden to prove that the defendants' conduct places a "substantial burden" on his "religious exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). Once the plaintiff establishes a substantial burden, defendants must prove that the burden both furthers a compelling governmental interest and is the least restrictive means of achieving that interest. *Id*. at 995. RLUIPA is to be construed broadly in favor of the inmate. *See* 42 U.S.C. § 2000cc-3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution").

A substantial burden is one that imposes a significantly great restriction or onus upon the identified religious exercise. *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004). A burden is substantial under RLUIPA when the state, "denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Shakur*, 514 F.3d at 888 (quoting *Thomas*

14

1    *v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981) (internal quotations

2    omitted)).  In other words, a prison policy that subjects the inmate to punishment for noncompliance

3    or that withholds a benefit for noncompliance places a substantial burden on free exercise.  *See*

4    *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005).  The extent to which particular prison

5    policy pressures an inmate to betray his religious beliefs would be a factual issue to be resolved at

     trial.

6            Here, plaintiff fails to meet the threshold showing of a substantial burden.  The court initially

7    questions whether the conduct at issue, distribution of religious literature, is "mandated by religious

8    belief."  In essence, plaintiff's argument is that proselytizing is not only part of his religious practice

9    but also part of his religious belief and that prison policies which limit his ability to proselytize

10   constitute a substantial burden.[8]   Plaintiff submits a blank "field service report" to indicate that he

11   is required, or at the very least expected to, distribute religious materials (#145, Ex. 26).  Plaintiff

12   presents no evidence, however, that his religious belief requires distribution of more than ten copies

13   at any particular time, nor does he submit evidence to demonstrate that his current ability to

14   distribute publications has been stymied by the regulation.  While a regulation that completely

15   prohibits the distribution of magazines would likely present a substantial burden, plaintiff is able to

16   possess and distribute ten.  Should he run out of publications, he is able to replenish his supply.

17   Plaintiff is not being subjected to punishment nor is any benefit being withheld.  Therefore, the court

18   finds that plaintiff has not demonstrated any issues of fact that AR 711 substantially burdens his free

19   exercise of religion.

20           Plaintiff's failure to meet this threshold showing is fatal to his RLUIPA claim.

21           c.      **Due Process**

22            Plaintiff challenges the confiscation of his magazines pursuant to AR 711 as a violation of

23   due process.  As described by the Supreme Court, three kinds of § 1983 claims may be brought

24

25           [8]      Although not at issue here and not addressed, the court notes that an exception for plaintiff,
26   allowing him an unfettered ability to proselytize to other inmates, may likely constitute a violation of the
     Establishment Clause.  *See, e.g., Hills v. Scottsdale Unified Sch. Dist. No. 48*, 329 F.3d 1044, 1053 (9th Cir.
27   2003) ("[T]he [school] District cannot refuse to distribute literature advertising a program with underlying
     religious content where it distributes quite similar literature for secular summer camps, but it can refuse to
28   distribute literature that itself contains proselytizing language. The difference is subtle, but important.").

against the state:

> First, the [Due Process] Clause incorporates many of the specific protections defined in the Bill of Rights. . . Second, the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them. [Third,] a § 1983 action may be brought for a violation of procedural due process. . . In procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law.

*Zinermon v. Burch*, 494 U.S. 113, 126 (1990) (internal citations and quotations omitted).  The court addresses each aspect of any due process claim in the three parts below.

First, the regulation does not impermissibly infringe on plaintiff's free exercise.  The court assumes that plaintiff cites *Sasnett v. Dep't of Corr.*, 891 F. Supp. 1305, 1312 (W.D. Wisc. 1995), because that court found that prisoners had a "cognizable liberty interest in their religious and legal materials."  What plaintiff fails to note is that the court in that case specifically noted that it had "no views on whether the challenged restrictions are related reasonably to a legitimate governmental purpose.  [It] only [held] that plaintiffs may have a cognizable liberty interest in their religious and legal materials."  *Id.*  Unlike the court in *Sasnett*, the issue of whether AR 711 is related to a legitimate penological interest has been decided in the *Turner* analysis above.  Although AR 711 infringes on plaintiff's liberty interest, plaintiff's right to free exercise is not unconstitutionally burdened by the regulation.

Second, the regulation does not constitute government action which violates the substantive component of the Due Process Clause.  Plaintiff argues that the restriction on personal property is "arbitrary [sic]limited" (#11, p. 11).  Where a plaintiff seeks to challenge deliberate executive action under the substantive component of the Due Process Clause, the question is whether the action is shocking to the judicial conscience.  *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998).  That prison officials limit an inmate's possession of personal property such as magazines to no more than ten does not shock the judicial conscience.

Third, to the extent that plaintiff argues any lack of procedural safeguards, the court finds that plaintiff fails to state any claim.  Plaintiff fails to outline a cognizable liberty interest in his possession of more than ten magazines.  In other words, plaintiff had no liberty interest in the

magazines that were confiscated; therefore, the court need not determine what process is due.

The court grants defendants' motion for summary judgment with respect to any due process claim.

### 4.    Count IV: Access to Courts

The state must provide access to an adequate law library or the assistance of persons with legal training. *Bounds v. Smith*, 430 U.S. 817, 828 (1977). The state may choose the means of access in order to satisfy this constitutional obligation. *Storseth v. Spellman*, 654 F.2d 1349, 1353 (9th Cir. 1981). Prisons "might replace libraries with some minimal access to legal advice and a system of court-provided forms . . . that asked the inmates to provide only the facts and not attempt any legal analysis." *Lewis v. Casey*, 518 U.S. 343, 356-57 (1996). "When an adequate method of access is provided and an inmate does not avail himself of it, he may not insist on an avenue of his choosing." *Storseth*, 654 F.2d at 1353. The right of access to the courts "guarantees no particular methodology but rather the conferral of a capability - the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts . . . . [It is this capability] rather than the capability of turning pages in a law library, that is the touchstone" of the right of access to the courts. *Lewis*, 518 U.S. at 356-57.

An inmate must show that a violation of his First Amendment right of access to the courts caused him actual injury. *Lewis*, 518 U.S. at 349. An "actual injury" is "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *Id*. at 348. Delays in providing legal materials or assistance that result in actual injury are "not of constitutional significance" if "they are the product of prison regulations reasonably related to legitimate penological interests." *Id*. at 362.

Where a prisoner asserts a backward-looking denial of access claim, he or she must show the loss of a "nonfrivolous" or arguable underlying claim. *Christopher v. Harbury*, 536 U.S. 403, 415, 417 (2002). The right of access to the courts is limited to nonfrivolous direct criminal appeals, habeas corpus proceedings, and § 1983 actions. *Lewis*, 518 U.S. at 353 n.3, 354-55. "A prisoner has no constitutional right of access to the courts to litigate an unrelated civil claim." *Simmons v. Sacramento County Sup. Ct.*, 318 F.3d 1156, 1159-60 (9th Cir. 2003).

17

Here, plaintiff fails to meet the jurisdictional requisite of demonstrating "actual injury." Plaintiff claims that he was precluded from filing suit pursuant to Nevada Revised Statutes § 233B.130.2 (c) (#11, p. 11; #145, p. 16). This is a state claim for review of agency regulations; it is not remotely related to plaintiff's conviction, sentence or conditions of confinement. Moreover, as defendants demonstrate, plaintiff's state claim is barred by state statute (#128, p. 22). Perhaps for this reason, plaintiff clarifies his argument in his opposition, explaining that he lost the ability to challenge the validity of the NDOC paging system. In other words, because of the NDOC paging system, plaintiff was unable to challenge the system. However, plaintiff's circular argument still lacks the jurisdictional requisite of an underlying "actual injury." An abstract challenge to NDOC's paging system does not constitute "actual injury." Plaintiff fails to point to any actual loss. Therefore, plaintiff has not demonstrated a viable claim for denial of access to the courts.

Therefore, summary judgment is proper on this claim.

**5.      Eleventh Amendment Immunity**

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity . . . against one of the United States by Citizens of another State . . . ." U.S. Const. amend XI.

For the purposes of sovereign immunity, "a suit against a state official in his or her official capacity is . . . no different than a suit against the state itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). A suit against a state may be brought in federal court only when (1) a state official is sued for prospective relief, *Ex Parte Young*, 209 U.S. 123 (1908), (2) Congress abrogates a State's immunity pursuant to its powers under section five of the Fourteenth Amendment, *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001), or (3) the State consents and waives its immunity. *See Pennhurst State Sch. & Hosp. v. Haldermann*, 465 U.S. 89, 99 (1984) (State's consent must be "unequivocally expressed").

**a.      § 1983**

A suit against a state official in his or her official capacity is a suit against the official's office; therefore, an official acting in his or her official capacity is not a "person" under section 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Since the state and its officials are not

18

considered "persons" within the meaning of section 1983, "they cannot be held liable under the statute for money damages." *Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914, 918 (9th Cir. 2003).

In his complaint, plaintiff names defendants in their official and individual capacities (#11) and requests damages. *Id*. It is clear that under § 1983, defendants cannot be sued in their official capacities for money damages. *Bank of Lake Tahoe*, 318 F.3d at 918. Therefore, to the extent that plaintiff seeks damages, the court dismisses with prejudice all § 1983 claims against defendants in their official capacities.

### b.     RLUIPA

RLUIPA has been considered constitutional under the Spending Clause. *See Mayweathers v. Newland*, 314 F.3d 1062, 1066-67 (9th Cir. 2002). The statute provides that prisoners may obtain "appropriate relief" against a government. 42 U.S.C. § 2000cc-2(a). The question remains as to whether the term only operates as a State's waiver of injunctive relief or whether it operates as a waiver of a suit in damages. Both the Fourth and Seventh Circuits have determined that the language in RLUIPA is not sufficiently specific to act as a waiver of immunity as to damages. *See Madison v. Virginia*, 474 F.3d 118, 130-31 (4th Cir. 2006); *Nelson v. Miller*, 570 F.3d 868, 883-85 (7th Cir. 2009); *but see Smith v. Allen*, 502 F.3d 1255, 1270-71 (11th Cir. 2007) (holding that because Congress failed to clearly define "appropriate relief," the court should presume the inclusion of money damages). The court here believes that while RLUIPA operates as a waiver to sovereign immunity as to equitable relief, it does not allow plaintiffs to pursue money damages against state defendants in their official capacities. *See, e.g., Mauwee v. Donat*, Order, No. 3:06-cv-00122-RCJ-VPC.

This circuit has been silent on whether RLUIPA authorizes suit against state defendants acting in their *individual* capacities. The Eleventh, Fifth, Fourth, and Seventh Circuits have held that state officials could not be held liable in their individual capacities under the statute. *Smith v. Allen*, 502 F.3d 1255 (11th Cir. 2007), *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009); *Rendelman v. Rouse*, 569 F.3d 182, 184 (4th Cir. 2009), *Nelson v. Miller*, 570 F.3d 868, 883-85 (7th Cir. 2009). "Congressional enactments pursuant to the Spending Clause do not themselves impose direct liability on a non-party to the contract between the state and federal government."

19

*Sossoman*, 560 F.3d at 325 (explaining that holding an individual liable under a contract between the state and federal government "blurs the lines of decisional responsibility" in that the "state legislature could point its finger at the federal government for tying needed funds to an undesired liability" and Congress could "point its finger at the state legislature for accepting funds and visiting liability on its citizens . . . even though the state itself did not enact the law or regulation in question"). The court agrees with this reasoning and furthermore agrees with the Seventh Circuit in its analysis that "[c]onstruing RLUIPA to provide for damages actions against officials in their individual capacities would raise serious questions regarding whether Congress had exceeded its authority under the Spending Clause." *Nelson*, 570 F.3d at 889, 889 n. 13 (reasoning that the "canon of constitutional avoidance" should be used to avoid constitutional doubts").

In this case, to the extent that plaintiff brings his RLUIPA claim against state defendants in their official capacities for damages and/or in their individual capacities for any relief, the court dismisses plaintiff claim.

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes the following:

- that counts V, VI, and VII, be dismissed without prejudice for failure to exhaust administrative remedies;

- that summary judgment be granted as to all claims in counts I, II, and IV;

- that plaintiff's motion for judgment on the pleadings/summary judgment be dismissed as moot;

- that plaintiff's "motion to supplement pleadings" be denied as moot; and

- that plaintiff's "motion pursuant to Rule 60" be denied as moot.

The court respectfully recommends that defendants' motion for summary judgment (#128) be **GRANTED** as all claims in count I, II, and IV, and that all claims in counts V, VI, and VII, be **DISMISSED** without prejudice for failure to exhaust. The court also recommends that plaintiff's "motion for judgment on the pleadings/summary judgment," motion to supplement pleadings (#139), and "motion pursuant to Rule 60" (#138) be **DENIED** as moot.

The parties are advised:

1.     Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within fourteen days of receipt.   These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.     This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#128) be **GRANTED** as to counts I, II, and IV.  All claims within count V, VI, and VII are **DISMISSED** without prejudice.   The court also recommends that plaintiff's "motion for judgment on the pleadings/summary judgment" (#120), "motion to supplement pleadings" (#139), and "motion pursuant to Rule 60" (#138) be **DENIED** as moot.

**DATED:** February 8, 2010.

_____

**UNITED STATES MAGISTRATE JUDGE**